**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**UNITED STATES OF AMERICA,**

                                                  **4:99cr23-RH**
**vs.**                                            **4:03cv9-RH/WCS**

**NGHIA LE,**

     **Defendant.**

_____/


## <u>REPORT AND RECOMMENDATION ON § 2255 MOTION</u>

Pending is Defendant's second amended motion filed pursuant to 28 U.S.C. §
2255.  Doc. 127.  The Government filed a response.  Doc. 134.  Defendant filed a
response and notice of supplementary authority.  Docs. 135 and 138.

The Government was directed to supply the briefs from the first appeal, and the
briefs were filed.  Docs. 139 and 141.  Further, the court directed that, "[i]f Defendant
has any evidence to support his claims he should produce it now, or allege specific facts
to show he could prove his claims if provided an evidentiary hearing."  Doc. 139, p. 3.
Defendant filed a supplement in response.  Doc. 142.

The Government did not specifically address some of the claims.  Defendant
argues that he is entitled to default as to those claims.  Default, however, is not
available with respect to post-conviction motions or habeas petitions.  <u>Aziz v. Leferve</u>,

830 F.2d 184, 187 (11th Cir. 1987) (default judgment is not contemplated in habeas

corpus cases, citations omitted); Goodman v. Keohane, 663 F.2d 1044, 1047, n. 4 (11th

Cir. 1981) (the Government's tardiness did not entitle petitioner to § 2241 relief);

Sparrow v. United States, 174 F.R.D. 491, 492-493 (D. Utah 1997) (discussing § 2255

Rules and denying default).

**Factual Background**

Defendant was charged with three counts: conspiracy to interfere with commerce

by threats or means of violence (robbery) in violation of 18 U.S.C. § 1951, interference

with commerce by threats or means of violence in violation of § 1951, and use and

carrying of a firearm during and in relation to a crime of violence in violation of 18 U.S.C.

§ 924(c)(1) and (2).  Doc. 1 (indictment).  The procedural history, facts, and evidence

are set forth in detail in Defendant's brief on direct appeal.  Attachment to Doc. 141, pp.

3-24.  *See also* United States v. Le, 256 F.3d 1229 (11th Cir. 2001), *cert. denied*, 534

U.S. 1145 (2002) (doc. 85 in this file).[1]

Briefly, Defendant had been involved in a romantic relationship with Loan Nguyen

(Loan), which she ended in 1994.  PSR, ¶ 13.  She married Hoang Nguyen (Hoang).[2]

Hoang opened two nail salons in Tallahassee and was known to keep large sums of

cash in the couple's Tallahassee home.  *Id.*  Defendant contacted Tung Thanh Ha,

a.k.a. Tommy (Ha), and Tuan Thanh Do, a.k.a. Jake (Do), to seek their assistance in

robbing Loan and Hoang Nguyen.  ¶ 14-16.  Ha and Do contacted Tan Van Nguyen,

a.k.a. Vinny (Tan), who in turn contacted Lam Viet Nguyen (Lam) and Thien Van

---

[1] Since it was published, hereafter references are to the published opinion.

[2] He is referred to as Kenny in the appellate opinion.  256 F.3d at 1231.

Nguyen (Thien) for assistance.  ¶ 16.  Ha, Do, and Tan traveled from California to Tallahassee in Ha's car, and Lam, Thien, and Linh Nguyen (Linh, an unindicted coconspirator) would travel by plane.  ¶ 17.  Ha was to pick up the three from the airport in Tallahassee.  *Id.*

Around February 15, 1998, Ha, Tan, and Do arrived and moved into Defendant's home.  ¶ 18.  On February 17th, the other three arrived by plane.  *Id.*  When no one was at the airport to pick them up, Lam telephoned Defendant's house and spoke to Defendant, who agreed to pick them up from the airport.  *Id.*  He did so and they stopped at a Denny's Restaurant, where it was discussed that Loan and Hoang probably had over $100,000 cash at their home.  *Id.*  Defendant then took them to a Days Inn Motel.  *Id.*

On February 20, Ha, Lam, Tan, Do, Thien, and Linh met at the motel to discuss the robbery, and it was decided that Linh would not participate.  ¶ 19.  The remaining five (Ha, Lam, Tan, Do, and Thien) then purchased cable ties, duct tape, dark clothing, masks, ammunition, tennis shoes, and gloves.  ¶ 20.  Defendant provided Ha with two handguns, a .25 caliber and a .380 caliber.  *Id.*

The five robbers drove around to survey the victim's residence and neighborhood, parked Ha's vehicle at a church, and walked to the residence.  *Id.*  Each wore dark clothes and a mask, and carried either a handgun, stun gun, or taser gun.  *Id.*  They rushed into the garage where they confronted Loan's brother, Tan Duy Nguyen (Tan Duy), and bound his hands and feet with cable ties.  ¶ 21.  They forced their way into the residence and encountered Loan, who tried to fight and was shot with a taser gun, causing her to drop her car keys.  *Id.*  Her hands and feet were also bound with

cable ties, and she was secured in a laundry room with Tan Duy.  *Id.*  Hoang meanwhile escaped through a window, and contacted police from the nearby home of Loan's parents.  ¶ 22.  The three month old child of Loan and Hoang was left on the bed of the residence, and the couple's fifteen month old child was placed in a closet by one of the five robbers. ¶ 23.

The robbers used duct tape to completely cover the heads of Loan and Tan Duy, leaving only enough room for them to breathe, and then they attempted to locate the cash believed to be stashed in the house.  ¶ 24.  They did not find cash.  They took a Movado wristwatch, and left in a vehicle belonging to Loan.  ¶ 24, 26.

Loan's father and two other brothers pursued Loan's vehicle in their vehicle, and Lam and Do filed several shots though none hit the vehicles.  ¶ 27.  The five robbers ultimately fled in Ha's vehicle, and drove to Pensacola.  ¶ 28.

The vehicle was located and the five were arrested on February 22, 1998.  ¶ 29. As set forth ahead, Defendant's residence was searched the following day.  He was not arrested until March 3, 1999, over a year later.

Defendant was convicted by a jury and sentenced to a term of 322 months. Docs. 49 (verdict) and 57 (judgment).  The conviction was affirmed, and the sentence was affirmed in part and vacated only as to the seven level firearm increase on the two Hobbs Act convictions.  256 F.3d at 1241.  On remand, Defendant was sentenced to a term of 262 months, and that sentence was affirmed.  Docs. 96 and 119.

In the § 2255 motion, Defendant raises fourteen grounds of ineffective assistance of counsel, many of which are interrelated.  Defendant was represented by Richard Smith at trial.

**Standard of Review**

The court does not reconsider under § 2255 errors raised and disposed of on direct appeal.  United States v. Nyhuis, 211 F.3d 1340 , 1343 (11th Cir. 2000) (citation omitted).  Defendant cannot simply recharacterize the claim, and "[a] rejected claim does not merit rehearing on a different, but previously available, legal theory."  Id., citation omitted.  If the issue had not previously been raised and decided against Defendant, on the other hand, it is procedurally barred and will not be reviewed absent a showing of cause and prejudice.  Id., at 1344 (citations and footnote omitted).

Ineffectiveness of counsel can constitute cause for a procedural default, but to establish ineffectiveness the arguments Defendant faults counsel for failing to raise must have been "significant enough to have affected the outcome of his appeal."  Id. (citation omitted).  Moreover, "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim."  Edwards v. Carpenter, 529 U.S. 446, 451, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000) (emphasis by the Court); see also Massaro v. United States, 538 U.S. 500, 509, 123 S.Ct. 1690, 1696, 155 L.Ed.2d 714 (2003) (ineffective assistance of counsel is cognizable under § 2255 whether or not it could have been raised on appeal).

Defendant asserts most of his claims under the guise of attorney error. Ineffective assistance of counsel is a two part inquiry.  "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and

must also "affirmatively prove prejudice."  Strickland v. Washington, 466 U.S. 668, 690, 693-694, 104 S.Ct. 2052, 2066-68, 80 L.Ed.2d 674 (1984).

In determining whether counsel's performance was deficient, Defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  466 U.S. at 686, 106 S.Ct. at 2064.  "The court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690, 104 S.Ct. at 2066. "[E]very effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 689, 690, 104 S.Ct. at 2065, 2066.  To satisfy this prong of Strickland, Defendant must show that "no competent counsel would have taken the action that his counsel did take."  Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted).  There are no rigid requirements, or absolute duty to investigate a particular line of defense.  Id.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

261 F.3d at 121 (citations omitted).

In addition to deficient performance, Defendant must also demonstrate prejudice.

> [A] petitioner must "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense."  This

requires a showing of more than "some conceivable effect on the outcome of the proceeding."  Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Although this standard is difficult to meet, it is significant that a petitioner must show only a reasonable probability that the outcome would have been different; he "need not show that counsel's deficient conduct more likely than not altered the outcome in the case."  When evaluating this probability, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."

Brownlee v. Haley, 306 F.3d 1043, 1059-60 (11th Cir. 2002) (*quoting* Strickland); United States v. Freixas, 332 F.3d 1314, 1319-20 (11th Cir. 2003) (*quoting* Brownlee).

The court need not approach the Strickland inquiry in any particular order, or address both prongs if an insufficient showing is made on one.  466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

It is noted that, in his notice of supplementary authority, Defendant asserts that an evidentiary hearing is required because this court cannot assume that counsel's conduct was strategic or reasonable.  Doc. 138, *citing* Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (other citations omitted).  Even if Wiggins did somehow change the presumption that counsel's actions are strategic, it did so in light of evidence demonstrating deficient performance (because counsel failed to uncover the evidence) and prejudice to the outcome, and does not change the analysis under Strickland.  In Wiggins, counsel failed to discover and present at sentencing extensive mitigating evidence (discussed in the opinion), and the death penalty was imposed. The Court noted that "the 'strategic decision' the state courts and respondents all invoke

to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."  539 U.S. at __, 123 S.Ct. at 2538).  In addition to deficient performance, the Court found prejudice under Strickland.  *Id.*, 123 S.Ct. at 2542-44.

**Prior Representation by Counsel**

Defendant makes a number of interrelated claims, all pertaining to his alleged retention of counsel before he gave his confession to FBI Agent Chester.  The court addresses these claims together.

In ground one, Defendant asserts ineffective assistance of counsel Smith for his failure to argue (at the suppression hearing) that Defendant was represented by retained counsel, William Porter, at the time of his interrogation and confession.  Doc. 127, p. 4.  Defendant alleges that he retained Porter prior to his arrest, Porter advised him not to talk to FBI Agent Chester or take a polygraph, and that Porter wrote a letter so stating to Chester.  *Id.*  He asserts that Smith never asked Chester how he knew that Defendant had retained counsel or if Chester received any communication from an attorney, and failed to establish that Chester received the letter from Porter.  *Id.*, p. 5.

In ground two, Defendant asserts that counsel was ineffective for failing to subpoena or interview Porter before the suppression hearing.  *Id.*, p. 5.  If Porter had been called, it is argued, he would have testified that he represented Defendant at the time of his confession, and that agents knew it.  *Id.*

In ground three, Defendant asserts ineffectiveness for counsel Smith's failure to file a motion to dismiss the indictment based on violations of Defendant's right to counsel and due process.  *Id.*, pp. 5-6.  He asserts that counsel knew before the

suppression hearing about Porter, and knew that a Government informant had been placed in Defendant's cell and was trying to undermine the attorney client relationship with Smith (a separate claim discussed ahead).  *Id.*, p. 6.

In ground six, Defendant asserts ineffectiveness for failure to utilize discovery to obtain Porter's letter, which would have clearly established that Defendant was represented by counsel at the time of his confession.  Doc. 127, p. 10.

The court's last order noted:

> Defendant claims that counsel was ineffective for failing to produce certain
> evidence.  If it is Defendant's contention that there is evidence or
> argument which was not produced by counsel, Defendant should provide
> it if available.  For  example, Defendant faults counsel for not producing a
> letter written by William Porter, but has not supplied the letter. . . .  If
> Defendant has any evidence to support his claims he should produce it
> now, or allege specific facts to show he could prove his claims if provided
> an evidentiary hearing.

Doc. 139, pp. 2-3.

Defendant responded that he does not have the letter, which was never disclosed by the Government or sought by counsel.  Doc. 142.  He states that the letter was not known by the defense until the suppression hearing, referencing an attached portion of the suppression transcript in support.  He clarifies that "[t]he crux of Le's claim is that counsel was ineffective for failing to obtain the letter and further that the prosecutor acted in bad faith in failing to disclose the letter."  *Id.*, p. 1.  Defendant contends the Government has the letter.  *Id.*, p. 2.

Prior to trial, counsel Smith filed a motion to suppress Defendant's post-arrest statements.  Doc. 23.  The Government filed a response.  Doc. 27 and Ex. A thereto (copy of waiver form).   A hearing was held on the motion to suppress.  Docs. 64 and 65

(transcripts).[3]  The testimony of FBI Agents Chester and Pellegrino was that, at the time

of Defendant's arrest on March 3, 1999, and his statement on March 4, 1999,

Defendant did not ask for counsel.  Doc. 65, pp. 48-64, 73-88.  Defendant's testimony

was that on those dates, Chester threatened to arrest his family and brother if

Defendant did not cooperate, and continued asking him questions after he said he did

not want to say anything.  *Id.*, pp. 94-97.  Defendant said that he asked for counsel

before he gave the statement at the FBI office on March 4, 1999.  Defendant said that

Chester told him it would be weeks to obtain counsel, and threatened to arrest

Defendant's family in the meantime.  *Id.*, pp. 98, 101-103.  Defendant asserted that,

contrary to what Chester told him, a lawyer was there about an hour after he gave the

statement, and if he had known there would be a lawyer available to him, he would not

have given the statement.  *Id.*, pp. 99-100.

All agreed that the conflicting testimony gave rise to a dispute of fact.  *Id.*, p. 108.

The court found the facts as testified by Chester and Pellegrino to be true, that

Defendant was advised of his rights and voluntarily gave a statement without invoking

his right to counsel.  *Id.*, pp. 108-110.  It was noted that, if Defendant's testimony were

taken as true, that he asked for counsel but questioning continued, then the court would

grant the motion to suppress.  *Id.*, p. 108.

On appeal, the Eleventh Circuit affirmed.  The court wrote:

Le argues that the Government violated his Fifth and Sixth Amendment
rights by questioning him without an attorney present and by coercing him
into signing a waiver of his *Miranda* rights and giving an inculpatory

---

[3] The hearing commenced on September 30, 1999, and was continued on
October 22, 1999.  The transcript of the former is doc. 64 (pp. 1-42), and the transcript
of the latter is doc. 65 (pp. 43-119).

statement by implicitly threatening his family.  He contends that the FBI knew he had a lawyer because he had been represented by a lawyer during the investigation. . . .  Because Le did not argue in the district court that the Government knew or should have known that he was represented by an attorney, we review this question for plain error. . . .

[T]he record does not show plain error in any event.  *The district court did not err because Le has not shown that he had an ongoing relationship with counsel*.   In this case, evidence of the alleged ongoing attorney-client relationship is scant.   Le testified that he had contacted a lawyer over a year before he was arrested who had told him not to take a polygraph test and who had written FBI Agent Chester to explain why he had told Le not to take the test.  Le did not give the name of the lawyer, and there appears to be no other evidence of the letter in the record.   Agent Chester testified that Le had contacted but not "retained" a lawyer concerning the polygraph.  Other than the letter that Le claims "his" lawyer wrote the FBI concerning the polygraph, the FBI had no contact with any attorney claiming to be Le's lawyer.

256 F.3d at 1237 (emphasis added, citations omitted).

Defendant now claims under § 2255 that counsel Smith was ineffective in litigating the suppression issue because he failed to argue or prove that Defendant was represented by Porter.   Defendant's alleged retainer of Porter was not around the time of his arrest and statement in March of 1999.  Chester initially became involved with this case on February 21, 1998.  Doc. 65, p. 48.  Chester searched Defendant's house on February 23, 1998, and interviewed Defendant and his brother Adam at that time about people who had stayed at the house.  *Id.*, pp. 65-66, 90.

Defendant, not under arrest, made statements about the people who had stayed there and said he would take a polygraph.  *Id.*, p. 67, 91.  He went to Havana with Chester to give him some phone numbers from his business caller ID box.  *Id.*, p. 67.  Chester talked to him on other occasions around this time, during which Defendant and

his brother identified the people who stayed at the house from photographic line ups.

*Id.*, pp. 68-69.

Defendant then became less cooperative, and stopped talking to Chester a few weeks after the search on February 23, 1998.  *Id.*, pp. 71-72.  At one point Chester asked Defendant whether he would take a polygraph examination.  *Id.*, p. 71.  Chester said that, during this period, Defendant "never retained an attorney.  He made contact with an attorney, who then told him not to take the polygraph."  *Id.*, p. 72.  Chester said: "He didn't want to talk to me anymore, so I didn't talk to him anymore."  *Id.*

Defendant testified that, during the search on February 23, 1998,[4] Chester had asked if he voluntarily would take a polygraph test, and thereafter he said that he:

> . . . tried to get an attorney to see, you know, what were my rights.  And I told him the situation and everything about it, and he advised me not to take a lie detector test because of the conflict between the victim being my ex-girlfriend and some of the guys that were staying at my house.

*Id.*, pp. 91-92.  Defendant said that Chester called several times afterwards, even though Defendant told him he had an attorney who did not want him to take a polygraph.  *Id.*, p. 92.  Defendant testified that "[t]he attorney also sent him a letter, also, stating the reason why.  He felt that – why he advised me not to take the lie detector test."  *Id.*, p. 92.

Defendant raised the same claim on direct appeal.  At set forth in the opinion on appeal, he argued on appeal that the court should adopt the reasoning of the Ninth Circuit, holding that the right to counsel is invoked where there is a nexus between the

---

[4] Defendant had been arrested for another charge on February 21, 1998.  *Id.*, p. 90.  Also, based on a BB gun found during the search on February 23, Defendant said that his probation was violated, and he "got out of the violating probation" the following April.  *Id.*, p. 92.

preindictment investigation and the charges ultimately brought, and the defendant has an "ongoing relationship with counsel which is known or should be known by the Government."  United States v. Le, 256 F.3d at 1237, *quoting* United States v. Harrison, 213 F.3d 1206, 1213 (9th Cir. 2000).  The Eleventh Circuit found that Defendant Le had not shown an ongoing relationship.  256 F.3d at 1237.

In these § 2255 proceedings Defendant has still not shown an ongoing relationship spanning the time from February, 1998, when he talked to attorney Porter, to the interview with Chester on March 4, 1999.  There is no showing that Porter assisted Defendant beyond advising him about a polygraph test around February of 1998, and certainly no showing that he actually represented him in March of 1999.  The fact that Defendant once talked to an attorney about whether to take a polygraph test does not establish an ongoing relationship over a year later, as this court and the Eleventh Circuit have already found.  Defendant's claim that Porter's letter was not known to his defense attorney until the hearing motion to suppress cannot be correct.  Defendant himself testified about Porter's letter at the hearing on the motion to suppress, so he obviously knew of it before the hearing.

Further, the claim that Defendant was represented at the time of his arrest and statement is contradicted by the record.  Defendant's testimony was that in March of 1999 he asked for an attorney, that Chester told him it would take weeks to appoint one, and that if he had known this was false he would not have given a statement.  This makes no sense at all if Defendant then had an ongoing relationship with Porter.  Defendant has not shown anything that his attorney could have done to change the

outcome.  Thus, ineffective assistance of counsel in litigating the suppression of his post arrest statements has not been shown.

**Audiotapes of the Jailhouse Informant**

Defendant raises a number of grounds regarding audiotapes of conversations he had with Donald Bean, an alleged jailhouse informant.  As part of ground three, Defendant asserts that counsel should have sought dismissal of the indictment after tape recordings from the jail were produced, quoting the court's statement that "[a]t some point, that kind of conduct could get to the point where it might support a motion to dismiss."  Doc. 127, p. 6.  Defendant argues that if counsel had filed a motion to dismiss at that time, it might have been granted.  *Id.*

In ground four, Defendant asserts that counsel was ineffective for failing to seek a second continuance of the suppression hearing to obtain the tapes to support a claim of Government misconduct.  *Id.*, p. 6.  Defendant asserts that the first suppression hearing was continued to allow production of the tapes, and by the second hearing the tapes had not been produced but counsel failed to so advise the court.  *Id.*  Defendant asserts that if the tapes were available, Chester would have been impeached and the outcome probably would have been different.  *Id.*, pp. 6-7.

In ground five, Defendant asserts that counsel was ineffective for failing to impeach Agent Chester with the tapes.  Doc. 127, p. 9.  "Had the tapes been available," it is argued, "Chester could have been impeached with the fact the informant, Bean, had been placed in Le's cell to extract information while Le was clearly represented by counsel."  *Id.*

Defendant's attorney filed a motion for suppression of statements made to Don Bean, a.k.a. Rama, at the Federal Detention Center (FDC).  Doc. 25.  Defendant was placed at the FDC on March 5, 1999.  He argued that Bean introduced himself as a person who could provide legal assistance, and befriended Defendant and his family.  Defendant argued that his right to counsel was violated by Bean's questioning.

Counsel also filed a motion for subpoena duces tecum to produce tapes of Bean, as it was believed that tapes were made of Defendant's conversations with Bean, as well as Bean's conversations with the FBI.  Doc. 26.  Bean allegedly suggested that Defendant dismiss his current counsel, so Defendant had instructed Smith to not file any motions as he was going to retain other counsel.  Counsel sought the tapes as necessary for suppression and impeachment purposes.

The Government responded that while Bean may or may not have been an informant, Bean would not be called as a witness.  Doc. 30.  The court granted Defendant's request as to calls between Bean and Defendant, but denied without prejudice the request as to calls between Bean and agents.  Doc. 29.

At the inception of the first suppression hearing, the court noted that the second motion to suppress might be moot as the Government did not plan to call Bean or introduce those statements.  Doc. 64, p. 2.  Defendant's lawyer then explained that there had been interference in his relationship with Defendant, that "Mr. Le was misled to a point by Don Bean, to my understanding, that almost put us at direct odds at one point in this case. . . .  He did not want any motions filed, because he was certain that Mr. Bean was going to provide him with a top-notch federal criminal defense lawyer."  *Id.*, pp. 10-11.

The court noted that the claim, that Defendant would not cooperate with Smith because a Government agent told him not to, did not have anything to do with the issue of the evidence to be presented, reasoning:  "If it's a prospect of some day having a due process, Sixth Amendment, challenge to the case proceeding at all, that's not anything that necessarily needs to be resolved before the trial, for that matter."  *Id.*, pp. 13-14.

Defendant's attorney later noted:

> You mentioned much earlier . . . if there was a problem with these tapes that we talked about earlier, that it could possibly be taken up later, post-trial relief, Sixth Amendment, or due process attack later.  These tapes are going to be erased in six months. . . .  Even if it's just preserved for Mr. Le for a later point in time, I have to ask that something be done in regard to that issue, also.

*Id.*, p. 26.

It was agreed that the tapes should be preserved.  *Id.*, pp. 26-28.  The court said that they would be delivered to the Government for preservation, and "if it becomes appropriate for me to see them in camera or for them to be shared with Mr. Smith under some kind of protective order, we'll do that."  *Id.*, p. 26.

At the second (continued) hearing, the Government advised that they had not yet received copies, but copies would be made for counsel who had supplied blank audiotapes to a person at FDC.  Doc. 65, pp. 45-46.[5]  The court noted that the copies could probably be finished by the time of trial.  *Id.*, pp. 46-47.

In context, it is clear that the tapes did not concern admissibility of evidence but were preserved in the event they might be relevant *eventually*, perhaps after conviction, for a due process claim that Bean interfered with Defendant's attorney's work.  That

---

[5]  Smith had supplied 84 tapes for the copies, but that was not due to the volume of recordings but the number of separate tracks.  *Id.*, pp. 46-47.

claim never ripened and is not before the court now.  It is not the case that Defendant's attorney failed to advise the court that he did not receive them, or that this would have resulted in continuance of the suppression hearing.  The claim that the audiotapes would probably have changed the outcome of the suppression hearing is contradicted by the record, as they were deemed not relevant for such purposes.

Defendant has not produced the tapes, or demonstrated that they proved Government misconduct sufficient for dismissal of the indictment.  He has not demonstrated ineffective assistance of counsel, or an independent due process or Sixth Amendment claim based on interference with the attorney client relationship, the very purpose for which the tapes were preserved.  He is not entitled to § 2255 relief on these claims.

**English Translations**

Defendant asserts a number of related claims based on counsel's alleged deficiencies with regard to tapes translated from Vietnamese to English.

In ground seven, Defendant asserts ineffectiveness because transcripts of the English translations were introduced by the Government, and counsel should have demanded that the actual tapes (in Vietnamese) be played to the jury.  Doc. 127, p. 11. He asserts prejudice because the jury did not hear all the evidence.  *Id.*

Defendant asserts in ground eight that a tape recording of he and his codefendant was used to impeach his testimony, and counsel was ineffective for failing to demand that the tape be played for the jury.  Doc. 127, p. 12.  Defendant asserts that the translation of the tape was wrong, but he was never allowed to listen to the tape.  *Id.*

He asserts that if the jury heard the tape, and his interpretation of what was said, the result would have been different.  *Id.*

In ground nine, Defendant asserts ineffectiveness for counsel's failure to object to the translation of the taped conversations from Vietnamese to English.  Doc. 127, p. 13. He states that the translations were not completely accurate, he so advised counsel, and he was prejudiced by the inaccurate translations.  *Id.*

In ground ten, Defendant asserts ineffective assistance based on counsel's failure to have alternative translations prepared of the tapes, to challenge the accuracy of the Government's translations.  Doc. 127, p. 14.  In ground eleven, he asserts error in counsel's failure to retain an expert in translation from Vietnamese to English, to challenge the evidence with testimony identifying inaccuracies in the translation.  *Id.*, p. 15.

In his affidavit, Defendant states that he listened "to numerous taped recording, along with the written translations," and that he told counsel the "that the translations were incorrect in a number of instances."  Attachment to doc. 127.

Defendant challenged the introduction of the translated transcripts on appeal. The court found that he had waived the claim.  256 F.3d at 1238.  The court also found that Defendant failed to show any prejudice, as "[h]e has not explained how the translations were inaccurate, nor has he indicated how playing the original recordings in court would have aided in his defense.  Therefore, his claim would still fail in any event." *Id.*

This court's last order noted that Defendant "faults counsel for failing to offer alternative translations of audiotapes to impeach translations made by the Government,

but does not provide alternative translations or state with particularity how the Government's translations were incorrect."  Doc. 139, p. 3.

Defendant responded that he identified the incorrect portions of the translations in his testimony at trial, and "he would have to listen to the tapes to identify those portions which support his claims regarding the translations."  Doc. 142, p. 2.  This is vague and insufficient.  However, applying great lenience in review of the pro se pleadings, the court has searched Defendant's testimony from the trial transcript for the incorrect translations allegedly identified there.

Defendant testified at trial that, in the car after his arrest, Chester read to him a transcript of a conversation between himself and Do.  Doc. 68 (transcript of third day of trial), pp. 660-661.  Defendant testified that Do called him from the jail three or four times.  *Id.*, p. 662.  Parts of the translated conversations were read to Defendant and he explained what he meant in the context of the conversations.  *Id.*, pp. 663-668.  He was asked what he meant when he told Do that people were telling the story wrong, and he responded that the stories were different.  *Id.*, pp. 664, 668.  "And from their translation, whoever translated it, said the wrong story, or something, or wrong.  But actually the statements were all different, and I told them, which was odd to me at the time.  [They] stayed at my house, and I couldn't understand why they didn't say that, and that's what I told them."  *Id.*, p. 664.

Defendant's testified his translation of the word was "differently," not "wrong," and he did not know what story was right and what was wrong:

> I don't know any story at all.  They were in here in Tallahassee, but they
> were saying they were in Fort Walton Beach.  Some guy is saying they
> were in Tallahassee.  I couldn't – I said, "You know, all of you guys' story

is different, your know."  And that's why I thought to myself, this is why you
guys are sitting in there, because your stories are like that.

*Id.*, pp. 668-669.

Defendant said that, as reflected in the transcript of the conversations, he

advised the others to keep quiet so they would not say anything to hurt themselves, not

because he thought they might talk about him.  *Id.*, p. 665.  The transcript of the tape

reflects that Defendant told Do, "[t]he devil talks a lot in here, I hear, too."  *Id.*, p. 666.

Defendant's explanation of this at trial was, "[i]f I can actually listen to that tape again, I

think I can translate it better than whoever did it on that part.  I don't know anything

about mentioning any devils."  *Id.*, p. 666.  But he admitted he was concerned about

Vinny talking too much.  *Id.*, pp. 666-667.

These minor errors do not alter the substance of the conversations.  Defendant

admitted that he advised, in the transcribed conversations, that people should not be

talking or answering questions.  Moreover, these alternative translations were brought

out through Defendant's testimony and the jury had the opportunity to consider them.

Even if expert testimony or playing the tapes would have confirmed that Defendant said

"differently" rather than "wrongly," and did not mention "devils," there is not a

reasonable probability that this would have changed the outcome of the proceeding.  No

other inaccuracies are identified.  Thus, ineffective assistance of counsel is not shown.

**Potential Plea**

In ground twelve, Defendant asserts counsel's ineffectiveness for failure to fully

advise him of any plea offer from the Government, or to advise regarding application of

the sentencing guidelines following a guilty plea as opposed to a guilty verdict.  Doc. 127, p. 16.

There is no indication that the Government made a plea offer or would have considered doing so.  Further, it is doubtful that Defendant could have provided substantial assistance in the prosecution of other participants in this offense as part of a plea and cooperation agreement.  The other five codefendants pleaded guilty and admitted participation in the offense.  *See* doc. 80, p. 54 (statement of the Government, noting that Defendant "stands in different shoes" than his codefendants who accepted responsibility).

Even without any plea offer or substantial assistance, a plea can benefit a defendant if it results in an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.  "Entry of a guilty plea prior to commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable . . . will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a)."  § 3E1.1, Application Note 3 (1998).[6]  "However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.  *A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right*."  *Id*. (emphasis added).  *See also* United States v. Rubio, 317 F.3d 1240, 1244 (11th Cir. 2003) (defendant not entitled to adjustment

---

[6] This would have been the version of the guidelines in effect at the time counsel would have advised of a possible plea and the initial sentencing.  Section 3E1.1 was not amended between 1992 and 2003.

where he initially offered to plead guilty, then withdrew his request and consistently

attempted to minimize his role in offense).

Defendant Le did not receive an adjustment for acceptance of responsibility.

PSR, ¶¶ 43-44a, 56.  Defendant said that he had nothing to do with the offense, and

that the finding of guilt did not mean he was guilty.  PSR, ¶ 43.  Through counsel and

when personally addressing the court at sentencing, Defendant maintained his

innocence.  Doc. 80 (transcript of February 17, 1999, sentencing), pp. 7, 12, 51-59.

Defendant also received an upward adjustment for obstruction of justice, based

on his false trial testimony that he never gave the firearms to coconspirators, had no

prior knowledge of the robbery, and had no involvement in choosing the victim.  PSR, ¶

41-42, 54; doc. 80, pp. 6-7.  The court found this testimony was willfully false and not

the result of confusion, mistake, or faulty memory.  Doc. 80, p. 7.

If Defendant had entered a guilty plea, he would not have given false testimony

at trial.  But that does not mean he would not have received an obstruction adjustment.

He may well have given the same or similar false testimony, or untruthfully tried to

minimize his role, at the plea colloquy.  The probability of this occurring is suggested by

the number of times Defendant in fact tried to minimize or disclaim his role in the crime.

Moreover, even aside from any subsequent testimony, Defendant's testimony at the

suppression hearing was rejected as not credible, and an obstruction of justice

adjustment might have been warranted on that alone.  *See* United States v. Yusuff, 96

F.3d 982, 989 (7th Cir. 1996) (finding obstruction of justice where defendant's testimony

at suppression hearing was in direct contrast to officers' testimony, which court found to

be credible).  An obstruction adjustment is generally inconsistent with an acceptance of

responsibility adjustment.  (*Id.*, rejecting acceptance of responsibility argument in light of obstruction, even though defendant admitted to substantive offense).

Defendant has not shown that counsel was ineffective in failing to communicate an unidentified plea offer, or in failing to give advice about the impact of a guilty plea on sentencing.  There is no demonstration that Defendant would have entered a plea, particularly given his insistence of innocence and accusation of Government misconduct to this day.  Further, given Defendant's testimony at the suppression hearing and persistent refusal to admit involvement in the offense, he has not shown a reasonable probability that, had he pleaded guilty, he would have received a lesser sentence. Ineffective assistance of counsel is not demonstrated.

**Jury Composition**

In ground thirteen, Defendant asserts error of counsel in failing to contest the composition of the jury, as none of the jurors had an Asian background.  He contends that Asians are a recognized group in the community, but were systematically excluded. Doc. 127, p. 17.  In ground fourteen, he asserts a violation of the Jury Selection Act, 28 U.S.C. § 1861-1878, as the jury pool did not represent a cross section of the community; specifically, that Asians were excluded.  *Id.*, p. 18.

These claims are unsupported by any particulars.  Indeed, Defendant himself testified at trial that he met Ha on the beach because it was so unusual to see another Asian.  Doc. 68, p. 618 ("just being Asian, you don't see much Asian around here, just seeing another Asian, kind of – it's just a meeting point, I guess, as far as how we met each other.").

Defendant has not provided any evidence to show that the composition of the jury was not a fair cross section of the community.  Further, if there were no Asians in this particular jury pool (as Defendant alleges), Asians could not have been systematically excluded by the prosecutor (as also alleged).  Without more specifics, these claims are facially insufficient to warrant relief.

**Recommendation**

In light of the foregoing, it is respectfully **RECOMMENDED** that the second amended § 2255 motion (doc. 127) be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on July 23, 2004.


s/    **William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**