**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA,**

**vs.**                                        **Case No. 4:99cr23-RH**
                                              **Case No. 4:03cv9-RH/WCS**

**NGHIA LE,**

    **Defendant.**

_____/

## SECOND REPORT AND RECOMMENDATION

Pending is Defendant's second amended § 2255 motion.  Doc. 127.  A first report

and recommendation was entered on July 23, 2003.  Doc. 143.  The court adopted the

report and recommendations except as to two issues and remanded those for further

consideration.  Doc. 148.  The first was to determine whether there existed a letter

written by Defendant's attorney a year before his arrest, and to inquire whether that

attorney still represented Defendant when he was arrested.  *Id*.  This evidentiary matter

relates to the claims collected under the heading "Prior Representation by Counsel" in

the first report and recommendation.  Doc. 143, p. 8.  The issue of prior representation

is relevant to a motion to suppress Defendant Le's confession to FBI Agent Chester.

The second issue was to determine whether there were audio recordings or other evidence of conversations between a jailhouse informant and Defendant.  This factual issue relates to the claims collected under the title "Audiotapes of the Jailhouse Informant" in the first report and recommendation.  Doc. 143, p. 14.  The court directed that further inquiry be allowed as to whether the Government directed the jailhouse informant to have conversations with Defendant, and whether the conversations would have supported a motion to dismiss the indictment on due process or right-to-counsel grounds.  Doc. 148.

The order left the procedures to follow on remand to my discretion.  *Id.*  I entered an order appointing counsel for Defendant, doc. 149, and held an evidentiary hearing. The hearing commenced on May 24, 2005.  Additional testimony was taken on June 7, 1005.  The last part of the evidentiary hearing was held on July 28, 2005.

Defendant filed written post-hearing argument.  Doc. 178.  The Government made oral post-hearing argument at the end of the evidentiary hearing.  Finally, a post-hearing stipulation was filed.  Doc. 187.

**Factual Background**

The statement of the factual background in the first report and recommendation, doc. 143, pp. 2-4, is adopted an incorporated herein by reference.

**Findings of Fact**

   **Prior representation by William Porter**

Defendant was indicted on March 2, 1999, and had a first appearance on March 5, 1999.  Docs. 1 and 4.  The offenses (home invasion robbery) occurred in February, 1998, and involved a number of other Defendants.  Those Defendants were indicted and prosecuted a year earlier.  United States v. Ha, et al., Case No. 4:98cr15-RH (indictment filed on February 23, 1998).

Shortly after the others had been indicted, Le was interviewed by F.B.I. Agent Matthew Chester.  Agent Chester suggested that Le take a polygraph test.  Le went to William Porter for legal advice and paid Porter $500.  Porter told Le he would charge him that amount to "look into the case."  Le credibly testified that Porter wrote Agent Chester and told Chester that he had advised Le not to take a polygraph.  Porter cannot find a copy of the letter, and he testified that he shredded Le's files.

Chester does not have a copy of the letter either, but he remembers getting the letter.  Chester said that before he got the letter from Porter, he had interviewed Le several times.   He said that Le said he wanted to clear his name and offered to take a polygraph test.  Chester said, however, that Le "put me off one or two times" about the polygraph.  After Chester got the letter from Porter, Chester said he called Porter and asked if he was retained by Le.  Porter told Chester that he was not retained, that he had just provided advice and the letter.  Chester said that this occurred in March, 1998.

Le said that he did not tell his trial attorney, Richard Smith, about the earlier contact with Porter because he did not know the significance of having an attorney until Chester mentioned it at the evidentiary hearing on the motion to suppress.  Le admits that after Porter wrote the letter to Chester, he had no further contacts with Porter.

Porter had an imperfect recollection of his contact with Le.  He thought that he had taken a small consultation fee from Le, to "get him started," but he knew the case was complicated and he knew he would require a bigger fee to take the case.  He said that the $500 fee was for three or four hours of work.  Had Le paid him more, he said that he would have extended his representation.  By March, 1999, Porter had closed his practice and was working for the State of Florida as a lawyer.  Porter thought he had done all that he was supposed to do for Defendant.

It is concluded from this that William Porter was not retained by Defendant Le for representation in this case, but was only consulted as to whether to take a polygraph test and to give preliminary advice.  Porter's duties to Le ended after he sent the letter to FBI Agent Chester and had answered Chester's questions about further representation.  Porter did not continue to represent Le after that.

### The Government's connection to the jailhouse informant

Le Testified that Donald Bean was a prisoner at the FDC, Tallahassee, when Le was a pretrial detainee, and Le got to know Bean there.  Le said that he wanted to enter a guilty plea in this case, but Bean convinced him that the Government had no case.  Le said that he thought that Bean knew more than he (Le) did.  Le said that Bean told him that his court-appointed attorney, Smith, was paid by the Government and was working for the Government.  Le said that Bean said he would get Le a "top notch lawyer from California" and pay for the lawyer.  Le said he told Richard Smith this.

Le said that Bean was the only person who advised him to go to trial.  Le denied telling Bean that Gadsden County Deputy Sheriff Kenon had talked to him about getting a new lawyer for him, or that Kenon had advised him to go to trial.

Le said that when Bean hold him that the Government did not have a case against him, Le knew that he was guilty.  He also knew that he had confessed his culpability to Agent Chester.

Le said that he was moved twice at the FDC, each time back into the presence of Bean.  He said that Kenon never visited him at the FDC, and he never talked to Kenon.

Le admitted that he had lied at the motion to suppress hearing when he testified that he had not told Agent Chester that he was involved in the offenses in this case.  He also admitted that he lied in his testimony at trial.

Bean was released from the FDC on expiration of sentence on August 18, 1999.  D. Ex. 4, tape 37, p. 5.  Le said that before Bean left the FDC, he found out that Bean was a jailhouse informant and had been keeping written notes of what Le had said to him.  Le said he immediately told Smith.  Le said he made two telephone calls to Bean after Bean left the FDC so that he could have a way to establish that Bean was an informant against him.  Le said that as soon as he told Smith that Bean had been an informant against him, his relationship with Smith "began to smooth out."

Allan Beiner, an F.B.I. Agent in 1999, was originally the case agent on this home invasion case.  He also was working on an investigation of another prisoner at the FDC at the time, Claude DuBoc.  The work on the DuBoc case and other cases began to take priority, and Beiner said that Matthew Chester became the case agent on the Le case.

Beiner said that Donald Bean was a jailhouse informant that he was then using to investigate future crimes planned by DuBoc.  Beiner said that he made it clear to Bean that Bean was never to talk to DuBoc about Duboc's pending case.  He told Bean that if

anything came up from DuBoc about his pending case, Beiner did not want to know about it.  Beiner said he told Bean that he was only interested in learning from Bean what Bean could learn from DuBoc about further crimes.

Beiner had conversations with Bean about DuBoc beginning in February, 1999. Bean was very helpful in that investigation.  A few weeks after Bean's release, Beiner paid Bean $10,000 for the information in the DuBoc case.

Beiner said that about a month and a half after he first talked with Bean, Bean called him about Le's case.  Beiner said he told Bean that the same ground rules applied to conversations with Le, that is,""listen, but walk away from any defense strategy.  If he got that information, I didn't want to know it," Beiner insisted that Bean was "severely admonished" to steer clear of anything having to do with Le's relationship with his attorney.  Beiner did not give specifics to Bean as to what this meant.

Bean said that he had information that guns and drugs were being distributed out of a bar owned by Gadsden County Deputy Sheriff Kenon.  Beiner said he had serious doubts about Bean's credibility, and he did not want to act on this information without corroboration since Kenon was a law enforcement officer.  Beiner said that the corroboration would be if Kenon came to visit Le as Bean said he would.  Kenon never came to visit Bean.  Bean was not called as a witness at trial, and none of the information Bean may have acquired from Le was used against Le at trial.

Agent Chester testified that he became the case agent on Le's case.  He said that the case initially came to light when an informant from Colorado tipped the police off about a planned home invasion robbery.  As a result of that tip, the police set up a surveillance of Le's home.  Le was suspected of being involved from the beginning.

Chester said he contacted Le and searched his residence.  They learned that the others involved in the robbery had stayed with Le and that one of the victims had once been Le's girlfriend.

Chester said that he did not know Bean until Bean called him on July 8, 1999.  Bean had been calling Beiner up to that point.  Beiner was not available that day, and Chester took the call.  In that call, Chester asked Bean: "what's some of the new stuff then?"  D. Ex. 4, tape 36, p.2.  Later, Chester asked Bean whether Le wanted to go to trial.  *Id.*, p. 4.  At the end, Chester told Bean that he is just a listening post: "He's got to bring up all this stuff and you just listen."  *Id.* P. 7.

James Lamont Kenon testified by telephone that he has been a Gadsden County Deputy Sheriff for over 29 years.  He knew Le because he had rented a building to Le's brother, and then to Le, for a fish market.  He said that when Le was in the FDC, Le called him and asked Kenon to come to the FDC to visit him.  Kenon said he talked by telephone with Le several times, but did not visit him at the FDC.  Kenon said he visited Le in the Marianna FCI after Le had been sentenced.  Kenon said that he was then interested in whether Le had any evidence as to several pending criminal cases.  Kenon said he never told Le that he would hire a lawyer for him.  Kenon denied telling Le not to work with Richard Smith.  Kenon denied any knowledge of any Vietnamese gangs.

Defendant has submitted a summary of a number of audio tapes of telephone conversations between Bean and either Beiner or Chester, and between Le and Bean after Bean left the FDC.  D. Ex. 3.  Defendant has also submitted transcripts of a number of the tapes.  D. Ex. 4.  These telephone calls were recorded when the caller (either Bean or Le) was in the FDC.

The following are things said on these tapes that indicate that Bean knew that he was not to talk with either DuBoc or Le about their pending cases, but was only to discovery evidence of other crimes or the planning of future crimes.[1]

**Tape 3, April 26, 1999**:  Bean tells Beiner that Le is involved in selling guns and counterfeiting checks.

**Tape 5, March 3, 1999**:  Bean tells Beiner that Le is trying to come up with an alibi witness.[2]

**Tape 6, March 3, 1999**:  Bean talks to Beiner about drugs and guns sold through a lounge.

**Tape 7, May 6, 1999**:  Bean tells Beiner that Kenon is coming, that someone is taking drugs to Panama City.

**Tape 8, May 10, 1999**:  Bean tells Beiner that Kenon has a friend who has a pawn shop that fences stolen property, and that Vietnamese gangs in Orlando, Tampa, and St. Petersburg are connected to this gang.  Bean asks Beiner if he should "play it like we did with DuBoc," and Beiner said not until the cop [Kenon] comes [to visit Le].

**Tape 11, May 18, 1999**:  Bean tells Beiner that Le is trying to contact some Vietnamese people who have recently moved into the area.  Le allegedly told Bean about a home invasion robbery in Ft. Walton Beach, and the "tattoo guy" is involved.  Bean says that Le told him that he has lots of guns in homes of friends in Havana, Florida.  Bean says that Le told him that the victims of the robbery in this case have moved and he "hopes to have someone talk to them about not pursuing this case."[3]  Bean tells Beiner that Kenon is encouraging Le to take the case to trial.  Bean says

---

[1] This is based upon the summaries, D. Ex. 3, and the transcripts, D. Ex. 4.

[2] This appears on its face to have been trial strategy if an alibi witness actually existed, and thus a matter off limits to Beiner.  But Le admits his guilt now and he had admitted his guilt to Beiner before the trial.  Thus, trying to find a false alibi witness prior to trial would have been commission of a future crime, obstruction of justice, and a permissible legitimate area of investigation for Beiner.

[3] This would be a future crime, obstruction of justice.

that Kenon is supposed to be finding a lawyer for Le and will help with the fee.[4]

**Tape 15, June 1, 1999**:  Bean tells Beiner that an officer at the FDC delivered a message to Le from Kenon.  The message was that Le should not plead guilty until he talks with Kenon.

**Tape 28, June 21, 1999**:  Bean tells Beiner that Le said that he and others owe money to Kenon for guns.

**Tape 31, June 25, 1999**:  Beiner reminds Bean he does not want to hear anything about DuBoc's defense.

**Tape 36, July 8, 1999**:  Chester asks Bean for the "new stuff."  Bean says Le told him that Le and others have been getting fake drivers' licenses from someone who works at the drivers' license bureau.  More information is related about the connection of Le to Kenon and others in other crimes. Bean states that Kenon has told Le not to enter a plea and he will get him another lawyer.  There is another mention of Le trying to "get to" the victim who used to be his girlfriend, presumably to obstruct justice.  The tape ends with Chester saying:  "Now, make sure you're not, he's got to bring up all this stuff and you just listen."  Bean responds:  "Yeah, I know.  I'm a listening post.  I'm not searching."

**Tape 37, July 12, 2999**:  Bean passes on more information about the false drivers' license scheme.

Likewise, the following is most of the evidence from the tapes showing that Bean

violated the instructions given to him by Beiner and Chester about not passing on

anything about a pending case, whether Le's case or the case of someone else:

**Tape 7, May 6, 1999**:  Bean tells Beiner that Jenner is some who is easy to convince to plead guilty.

---

[4] As noted ahead, Beiner explained that his interest in this case was to explore whether it was true that drugs and guns were being sold from a bar connected with Kenon and Le, and whether Kenon was promising a lawyer for Le, and advising him to go to trial, because he was trying to silence Le about these other offenses.  Beiner said he was waiting for Kenon to show up at the FDC as corroboration of Bean's allegations.  This was a legitimate purpose for using Bean to acquire this information.

**Tape 15, June 1, 1999**:  Bean says that Le is "about" to tell him about the role of each participant in the home invasion robbery.

**Tape 17, June 3, 1999**:  Bean tells Beiner the roles of each participant in the robbery as told to him by Le, and where the guns used in the robbery had been hidden.

**Tape 17, June 4, 1999**:  Bean gives Beiner more information about what Le told Bean about what happened in the robbery.

**Tape 25, June 18, 1999**:  A discussion about whether Penny Shelfer, a Defendant in the DuBoc case, is going to enter a plea.

**Tape 36, July 8, 1999**:  Chester asks if Le has mentioned wanting to go to trial.  Bean says he is working on Le to enter a guilty plea.

**July 37, July 12, 1999**:  Another allusion to Bean's attempt to counter the alleged advice from Kenon to go to trial.

With regard to Tapes 12 and 13, a conversation between Beiner and Bean on May 21, 1999, Beiner explained that his interest was in the connection between Le and Kenon and the allegation that drugs and guns were being sold.  Beiner said that Bean told him that Kenon was getting Le another lawyer and encouraging Le to go to trial, and that Kenon planned to visit Le to encourage these things.  Beiner said that if this was true, then Kenon had a motive to try to keep Le quiet and not give evidence about the guns and drugs.  Thus, Beiner's interest in was not in Le's defense during trial, or to interfere with Le's trial strategy, but to explore the allegations that Kenon was trying to cover up evidence of his own offenses.  Beiner had serious doubts about Bean's truthfulness, and none of this panned out.  Kenon never came to visit Le.  Beiner said this kind of corroboration was essential before he would open an investigation of these allegations.

On Friday, June 11, 1999, Beiner talked to Bean in a telephone conversation. On the first tape 22 (which was not transcribed, but was played at the hearing) Bean told Beiner that they had moved Le with a bunch of people opening a new dormitory, D Dorm.  Bean wanted Le moved back because, said Bean, Le did not want to leave, and had been his roommate.  Beiner responded: "I cannot ask that Le be put in with you." Bean said, "It's ok, Le will come back to me and I can get to that note."  On the continuation of that conversation, tape 22 (which was transcribed), Beiner states: "They're gonna do it.  They were afraid it would look too obvious."  Tape 22, p. 1. Beiner then said that he "didn't tell them, but the more I thought about it, the less I was inclined to encourage the concept that you had enough clout to get them moved."  *Id*. He then said:  "And so, they've already gone downstairs, indicated that some may have been sent down there in error but [they are] going to let the dust settle and come Monday, a couple might be moved back."  *Id*.

Beiner explained that he let Bean think that he (Beiner) would have Le moved so that Bean would have better access to Le, but Beiner said that he had no intention of doing that.  At a continuation of the hearing, Beiner testified that he did call the FDC once to have Le moved, but this was because he discovered that Le was assigned to a unit in which other Defendants involved in the home invasion robbery, including cooperating Defendants, were housed.  He said that Le's assignment to this unit violated a letter of instruction from the United States Attorney asking that Le be separately housed from other defendants in this case.  Beiner did not mention his role in this move in the first part of this evidentiary hearing.

Le testified that he was originally in A Unit at the FDC.  He states that he was moved with 10 or 15 other prisoners to D Unit.  He said he did not know any of these prisoners, and he said that D Unit was a new unit at that time, and it had no other prisoners in it.  Le said that shortly after this moved, he was moved back to A Unit, where Bean was housed.  Le said there were no co-defendants in A Unit.

Le's testimony is correct.  The parties have stipulated that during June, 1999, none of the prisoners involved in Le's case were housed in D Unit.  Further, it was not until December 1, 1999, that the United States Attorney's Office advised the FDC officials to keep Le separated from the other defendants involved with this case. Therefore, Le's assignment to D Unit could not have violated the "separatee" letter of December 1st, nor did it improperly associate Le with the others involved in his case.

Richard Smith, Le's trial attorney, said he was unfamiliar with any prior relationship between Le and William Porter.  Smith said that his relationship with Le was somewhere between "not great"and "id not trust a word I said." Smith said that Le was intelligent and they discussed the options.  He said that he and Le never discussed whether Le would plead guilty, and he operated under the understanding that the case would go to trial from the start.  He was not sure, but Smith thought Le may have said that Bean told him that he (Bean) would get a ""top notch lawyer" for him.  He had no memory of Le expressing any desire to "fire" him.  Smith did recall being upset with Bean, and thinking that Bean was an FBI informant.  Smith thought that Bean's activities explained why he (Smith) was having difficulties in his relationship with Le.

Smith said that during the period when Le did not trust him, he had the discovery in the case and did other things to prepare the defense.  He said that just before trial, he

felt Le became truthful with him and gave him all that he needed to defend him.  He said "we had an epiphany."

**Legal Analysis**

The legal issue is whether Defendant Le's counsel, Richard Smith, was ineffective for failing to pursue the two claims discussed above with respect to Government interference with Le's right to counsel.  The first claim concerns a possible motion to suppress Defendant's confession because Defendant was allegedly represented by Porter at the time of the interrogation.  This claim had no support.  Porter was not Defendant's lawyer when he was questioned by law enforcement agents and made the admissions to Agent Chester.  Porter had been consulted a year earlier, but he was not retained by Le.  Consequently, Smith could not have been ineffective for failing to pursue this claim.

The second issue is whether Smith was ineffective for failing to seek a remedy (dismissal of the indictment or a new trial) for Government interference with his attorney-client relationship with Le.  The underlying claim may be analyzed as either a Due Process violation (outrageous Government conduct) or a Sixth Amendment violation (deprivation of effective assistance of counsel).

The subsidiary Due Process claim will be addressed first.

Our cases have recognized that "in the rarest and most outrageous circumstances" government conduct might violate " 'that fundamental fairness, shocking to the universal sense of justice mandated by the due process clause of the fifth amendment.' " *United States v. Tobias,* 662 F.2d 381, 386-87 (5th Cir. Unit B 1981), *quoting United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)."

United States v. Edenfield, 995 F.2d 197, 100 (11th Cir. 1993), *cert. denied*, 513 U.S.

818 (1994); United States v. Ofshe, 817 F.2d 1508, 1516 (11th Cir.), *cert. denied*, 484

U.S. 963 (1987).

In Ofshe, Ofshe retained attorney Glass to represent him in a drug case in Miami.

817 F.2d at 1510.  Glass learned that he himself was a target of a drug investigation

originating in Chicago, and offered to help the Government to diminish his own criminal

liability.  *Id.*, at 1511.  Glass mentioned Ofshe as a target.  *Id.*  Glass was told by the

Government not to reveal any privileged matter.  *Id.*  Glass revealed that he had learned

of drug dealing by other people through his representation of Ofshe, and he learned that

Ofshe wanted him (Glass) to find a buyer for a ton of marijuana (a future crime).  *Id.*

Glass agreed to wear a body bug, and was to engage Ofshe in conversations about

these offenses.  *Id.*  "The conversations included some unplanned discussions about

[Ofshe's] Florida case including the timing and likelihood of success of the motion to

suppress."  *Id.*  The Government allowed Glass to remain as an ineffective

representative of Ofshe for 10 months.  *Id.*  However, nothing learned by the law

enforcement agents through the use of Glass was ever communicated to the AUSA who

was prosecuting Ofshe, and there was no evidence that Ofshe's defense was

prejudiced in any way.  *Id.*, at 1515.  The court held that it was not error for the trial

court to deny a motion to dismiss the indictment for invasion of the attorney-client

privilege under these circumstances.  The court also held that a Due Process violation

for outrageous government conduct was not shown.

The facts of this case are far less compelling than in Ofshe.  Le has not shown

that he was deprived of a fundamentally fair trial.  While Bean may have impaired Le's

relationship with Smith, Bean himself was not Defendant's attorney, and he did not do so as a result of "outrageous" Government conduct.

Beiner relied on Bean to obtain important evidence about DuBoc's planning of future crimes.  Bean was very helpful to the Government in providing true information about DuBoc, and that information, it is judicially noticed, resulted in the conviction of DuBoc for these additional crimes.

In the course of that relationship, Bean also funneled information to Beiner and Chester about alleged additional crimes or future crimes with which Le and others might have been involved.  Bean took instructions from Beiner and Chester very poorly, and several times professed to have tried to encourage Le to plead guilty.  He said he did this to counter the advice that Kenon was giving Le, but this was probably untrue.  Le testified credibly that he never spoke with Kenon, and all of his conversations were with Bean.[5]  The weight of the evidence shows that Bean instead was attempting to persuade Le to go to trial, as Le testified, so that Bean could continue to play the role of law enforcement helper.

Beiner and Chester did not instruct Bean to do this, however.  They were clear in their instructions to Bean that Bean was not to interfere with Le's pending case.  Beiner and Chester did not know that Bean was the one, rather than Kenon, who was disparaging Le's relationship with Smith.  Further, Beiner and Chester were also legitimately exploring other alleged crimes connected to Kenon, and had an interest in whether Kenon was attempting to interfere with Le's defense to cover up his own offenses.

---

[5]  Kenon said he spoke with Le about visiting him at the FDC, but not about his case.

Chester stepped over the line on one occasion, asking Bean whether Le wanted "to go to trial."[6]  When Bean said "I am slowly working on trying to get him to plea . . .," Chester should have immediately admonished Bean that he was not to interfere with Le's trial strategy.  But Chester ended that conversation by warning Bean that "he's got to bring up all this stuff and you just listen."  In context, then, the error was minor.  This did not make Bean the agent of the Government for all that Bean was doing to try to impair the relationship of Le with his lawyer.

Le has shown that he was moved to D Unit and then back to the Unit where Bean was housed, and Le has shown, contrary to Beiner's testimony, that this move back to Bean's Unit was not because the co-defendants were in D Unit.  It is concluded that Beiner asked that Le be moved back to D Unit to be near Bean.  However, Beiner was legitimately using Bean to try to discover other crimes allegedly committed by Le and Kenon, and he had instructed Bean not to interfere with Le's relationship with his attorney in his pending case.  Beiner did not know that it was Bean, not Kenon, who was disparaging Smith.  Thus, that Beiner moved Le back to the Unit in which Bean was housed did not make Bean the agent of the Government for all that Bean was doing to try to impair the relationship of Le with his lawyer.

But of much greater importance, the damage done by Bean to Le's relationship with Smith did not affect the outcome of this case or the performance of Smith.  Bean was released from the FDC on expiration of sentence on August 18, 1999.  D. Ex. 4, tape 37, p. 5.  It was *before* this time, said Le, that Le found out that Bean was an informant.  Le said that as soon as he discovered Bean's role, he told Smith that Bean

---

[6] Tape 36, July 8, 1999, p. 4.

had been an informant against him.  Le said that his relationship with Smith then "began to smooth out."  Smith, meanwhile, had been preparing the case all along.  Smith corroborated Le's version of events.  He said that prior to trial, there was an "epiphany," and Le came to trust him.  There is no evidence that Smith failed to do anything either before or during the trial to defend Le as a consequence of Bean's improper activity. Between August 18, 1999, and trial in December, 1999, there was ample time for the attorney-client relationship to heal.

Le argues that, had Bean not made him distrust Smith, he would have entered a guilty plea.  Le makes this argument in an attempt to show specific prejudice to the outcome.  Support for this claim is missing.  Lee knew by August 18, 1999, that Bean was an informant.  Smith said that Le was intelligent and made intelligent choices.  Le had adequate time before the trial to meet with Smith and decide whether or not to enter a guilty plea.  The record shows, however, that Le was not predisposed to plead guilty, despite his earlier confession.  In his two conversations by telephone with Bean after Bean left the FDC, Le repeatedly stated that the Government had no evidence against him.  Le twice testified untruthfully about his role in these offenses before this court, which is further evidence that he consistently intended to deny involvement and go to trial.  Thus, there is no evidence that Le failed to enter a guilty plea as a result of Bean's interference with his relationship with Smith.  For these reasons, there was no Due Process claim to make.

The second claim Smith might have made is based upon the Sixth Amendment. A claim of ineffective assistance of counsel normally requires proof of both attorney error and prejudice to the outcome.  Strickland v. Washington, 466 U.S. 668, 686, 104

S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).  Le has not shown prejudice to the outcome

for the reasons discussed above.  If prejudice to the outcome is an essential component

of any claim that Smith might have made, then it cannot be said that Smith was

ineffective for failure to make it.

The law is somewhat unclear as to whether prejudice to the outcome must be

shown where there has been interference with a defendant's relationship with his

attorney as shown in this record.  In Weatherford v. Bursey 429 U.S. 545, 97 S.Ct. 837,

51, L.Ed.2d 30 (1977), Weatherford worked as an undercover informant and was

indicted along with Bursey to preserve his undercover role.  429 U.S. at 547, 97 S.Ct. at

840.  Bursey's attorney held a trial strategy meeting with Bursey and Weatherford,

thinking that Weatherford was a real co-defendant.  *Id.*  None of the discussions at that

meeting of trial evidence and strategy was revealed to the prosecutor, however, and

none of the information obtained was used at trial against Bursey.  *Id.*  Weatherford was

a witness against Bursey, but not as to matters he heard during the attorney-client

conference.  *Id.*, at 549, 97 S.Ct. at 840.  Bursey was convicted and brought a § 1983

suit against Weatherford, alleging violation of his Sixth Amendment right to counsel.

The court of appeals had found this to have been a per se violation of the Sixth

Amendment, without the requirement of a showing of prejudice to the outcome.  The

Supreme Court rejected a *per se* rule, holding:  "There being no tainted evidence in this

case, no communication of defense strategy to the prosecution, and no purposeful

intrusion by Weatherford, there was no violation of the Sixth Amendment. . . ."  *Id.*, at

558, 97 S.Ct. At 845.

In United States v. Morrison, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), two DEA agents met with a defendant who they knew had retained counsel, encouraging her to cooperate and disparaging her attorney.  449 U.S. at 362, 101 S.Ct. at 666.  Defendant did not supply any information to the agents, and contrary to the advice of the agents, "continued to rely upon the services of the attorney whom she had retained."  Id., at 363, 101 S.Ct. at 667.  The issue presented was whether the indictment should nonetheless have been dismissed.  The Government argued that the claim failed for lack of a showing of prejudice to the outcome, but the Court assumed without deciding that the Sixth Amendment has been violated.  Id., at 364, 101 S.Ct. at 667.  The Court then cited Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and other cases, noting that dismissal of the indictment was not warranted; rather, "[o]ur approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial," Id., at 365, 101 S.Ct. at 668.  For example, in Gideon, the remedy was a new trial.  The Court reasoned that the "remedy in the criminal proceedings is limited to denying the prosecution the fruits of its transgression."  Id., at 366, 101 S.Ct. at 669.  The Court concluded that "there being no claim of any discernible taint, even the traditional remedies are beside the point," Id., at 365 n. 2, 101 S.Ct. at 668 n. 2.

Morrison, therefore, seems to stand for the broader proposition that absent prejudice to a Defendant, no violation of the Sixth Amendment occurs when the

Government interferes with her relationship with her attorney.[7]  The more limited holding

of the case, however, is that dismissal of an indictment was not warranted under the

circumstances presented.

Cases were the Sixth Amendment in violated *per se*, without a showing of

prejudice to the outcome, are generally very clearly defined and few in number.  <u>Gideon</u>

is one.  This is so because "the right to the effective assistance of counsel is recognized

not for its own sake, but because of the effect it has on the ability of the accused to

receive a fair trial.  Absent some effect of the challenged conduct on the reliability of the

trial process, the Sixth Amendment guarantee is generally not implicated."  <u>United</u>

<u>States v. Cronic</u>, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984)

(citations omitted).  The Court left open the possibility of a *per se* violation in limited

circumstances:

> There are, however, circumstances that are so likely to prejudice the
> accused that the cost of litigating their effect in a particular case is
> unjustified.  Most obvious, of course, is the complete denial of counsel.
> The presumption that counsel's assistance is essential requires us to
> conclude that a trial is unfair if the accused is denied counsel at a critical
> stage of this trial.  The presumption that counsel's assistance is essential
> requires us to conclude that a trial is unfair if the accused is denied
> counsel at a critical stage of this trial. . . .  Circumstances of that
> magnitude may be present on some occasions when although counsel is
> available to assist the accused during trial, the likelihood that any lawyer,
> even a fully competent one, could provide effective assistance is so small
> that a presumption of prejudice is appropriate without inquiry into the
> actual conduct of the trial.

466 U.S. at 658-660, 104 S.Ct. at 2046-2047 (citations and footnotes omitted).

---

[7] The Court did not so rule, however, because the Court declined to address the
Government's contention that there could be no Sixth Amendment violation absent
prejudice.  449 U.S. at 364, 101 S.Ct. at 667.

Cronic cited Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) as

an example of a case where prejudice should be presumed.  In Powell, "defendants had

been indicted for a highly publicized capital offense."  466 U.S. at 660, 104 S.Ct. at

2047.  A lawyer did not make an appearance for the six defendants until the day of trial,

and he had not had an opportunity to prepare the case.  *Id.*  The Court in Cronic

concluded that apart from circumstances of such a magnitude that prejudice is

presumed, "there is generally no basis for finding a Sixth Amendment violation unless

the accused can show how specific errors of counsel undermined the reliability of the

finding of guilt."  466 U.S. at 659, n. 26, 104 S.Ct. at 2047, n. 26, *citing* Strickland v.

Washington, 466 U.S. 668, 693-696, 104 S.Ct. 2052, 2067-69, 80 L.Ed.2d 674 (1984)

(other citations omitted).

United States v. Walker, 839 F.2d 1483 (11th Cir. 1988), appears to be a case of

this sort.  In Walker, the Defendant was encouraged by law enforcement officers to

cooperate and give evidence against himself and others, but not tell his attorney.  839

F.2d at 1484.  When this came to light after a jury trial and conviction, the trial court

granted a new trial but refused to dismiss the indictment.  The Eleventh Circuit affirmed,

finding that the grant of a new trial cured the assumed Sixth Amendment violation.  The

court was asked to rule that an interference with the attorney-client relationship to this

extent "calls for sanctions regardless of the fact that no specific prejudice may be

identifiable."  *Id*. At 1486.  The court noted that the Supreme Court decisions "do offer

some support for such a holding," stating that "it can be argued that causing a *complete

breakdown of communication* between a defendant and his attorney, which was not the

case in *Morrison*, constitutes a constructive denial of counsel." *Id.* (emphasis added).
Strickland, 466 U.S. at 692, 104 S.Ct. at 2067, was cited.

Several courts of appeal have read Weatherford and Morrison, and the rejection
in those cases of a *per se* rule, as not applicable where the Government intrusion into
the attorney-client relationship is intentional and lacking in any legitimate law
enforcement purpose. Shillinger v. Haworth, 70 F.2d 1132, 1140 and 1142 (10th Cir.
1995), citing United States v. Costanzo, 740 F.2d 251, 254 (3d Cir. 1984), *cert. denied*,
472 U.S. 1017 (1985) and United States v. Levy, 577 F.2d 200, 210 (3d Cir. 1978).
Shillinger said:  "In other words, we hold that when the state becomes privy to
confidential communications because of its purposeful intrusion into the attorney-client
relationship and lacks a legitimate justification for doing so, a prejudicial effect on the
reliability of the trial process must be presumed."  70 F.3d at 1142.

Shillinger cited Cronic, and then listed the few cases in which the Supreme Court
itself had found a violation of the Sixth Amendment without requiring prejudice to the
outcome:

> The cases in which state interference with the right to counsel has been
> held to violate the defendant's Sixth Amendment rights per se include the
> following circumstances: prohibiting direct examination of the defendant by
> his counsel, see *Ferguson v. Georgia,* 365 U.S. 570, 81 S.Ct. 756, 5
> L.Ed.2d 783 (1961); requiring those defendants who choose to testify to
> do so before any other defense witnesses, see *Brooks v. Tennessee*, 406
> U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972); refusing to allow defense
> counsel closing argument in a bench trial, see *Herring v. New York*, 422
> U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); and prohibiting any
> consultation between a defendant and his attorney during an overnight
> recess separating the direct-examination and the cross-examination of the
> defendant, *see Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47
> L.Ed.2d 592 (1976).  *See also United States v. Decoster*, 624 F.2d 196,
> 201 & nn. 14-17 (D.C. Cir.), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62
> L.Ed.2d 311 (1979); 2 LaFave & Israel, *supra*, § 11.8(a).  The District of

Columbia Circuit has explained the rationale behind the use of a *per se* rule in these cases:

> These state-created procedures impair the accused's enjoyment of the Sixth Amendment guarantee by **disabling** his counsel from fully assisting and representing him. *Because these impediments constitute direct safe interference with the exercise of a fundamental right, and because they are susceptible to easy correction by prophylactic rules, a categorical approach is appropriate.*

*Decoster*, 624 F.2d at 201 (emphasis added).

70 F.2d at 1141-1142 (emphasis added in bold)

Even if <u>Shillinger</u> and similar cases were binding in this circuit, there has been no showing here of a purposeful intrusion into Defendant Le's relationship with his attorney for an illegitimate purpose.  Bean was acting on his own to a degree unknown by either Beiner or Chester, and he acted against their instructions.  Further, the Government had a legitimate interest in gaining information about DuBoc's criminal plans, as well as any other information Bean might have with regard to the unrelated criminal activity of Le, and the criminal activity of people other than Le.

Further, a Sixth Amendment standard that looks to Governmental motivation and utility ("purposeful intrusion" for a "a legitimate justification") seems analytically flawed. While Governmental motivation and utility are relevant for a Due Process "outrageous Government conduct" claim (the point made in <u>Decoster</u>), whether a defendant's counsel has been "disabled" in any material way as the decisive factor is more consistent with the Supreme Court Sixth Amendment cases, particularly <u>Strickland</u> and <u>Cronic</u>.  The cases cited immediately above, in which the "prejudice to the outcome" portion of <u>Strickland</u> is presumed, are limited to those in which the attorney was hobbled

at an important stage of the trial.  The Sixth Amendment question is the effectiveness of counsel, not the behavior, motivation, or purposes of the Government.

Nor is <u>Walker</u> dispositive.  While Bean may have caused a "complete breakdown of communication" between Le and Smith prior to August 18, 2005, the facts of this case differ significantly from those in <u>Walker</u>.  Beiner and Chester did not purposefully direct Bean's activities or acquiesce in those activities with full knowledge of them.  Further, the weight of the evidence shows that Le and Smith had enough time to regain trust in one another after August 18, 1999, and in fact did so.  No actual impairment of trial strategy has been demonstrated.  Thus, this is not a case where "the likelihood that any lawyer, even a fully complentent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."  <u>Cronic</u>, 466 U.S. at 660, 104 S.Ct. At 2047.

Accordingly, Le's attorney had no basis for any claim regarding Bean.  As a consequence, ineffective assistance of counsel has not been shown.

**The Corrected Motion to Amend, Doc. 163**

Defendant filed a corrected motion to amend the § 2255 motion to bring a claim pursuant to <u>United States v. Booker</u>, 543 U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).  Doc. 163.  That motion was denied by order.  Doc. 167.  The reasoning of that order is incorporated herein by reference.  If Defendant objects to that order, Defendant may file an objection at this time to this report and recommendation.

Accordingly, it is **RECOMMENDED** that the Court approve the order denying

amendment, doc. 167, adopt these further findings of fact, and **DENY** Defendant Le's §

2255 motion, doc. 127, **WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on August 26, 2005.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**